# UNITED STATES DISTRICT COURT
for the
District of Oregon

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

A gray 2023 Kia Soul with Pennsylvania license plate MCS-0690 as described in Attachment A

)
)
)
)
)
)
)

Case No. 3:24-mc-1085

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A gray 2023 Kia Soul with Pennsylvania license plate MCS-0690 as described in Attachment A hereto,

located in the _____ District of _____Oregon_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1341, 1343, and 1349 | Conspiracy to Devise or Intending to Devise Any Scheme or Artifice to Defraud by Means of Mail or Wire Communications |

The application is based on these facts:
See affidavit which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Special Agent Caryn Ackerman, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone at __4:00 pm__ *(specify reliable electronic means)*.

Date: October 22, 2024

_____
*Judge's signature*

City and state: Portland, Oregon

Hon. Jolie A. Russo, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched consists of one gray 2023 Kia Soul with Pennsylvania license plate MCS-0690 (hereinafter the "**Vehicle**"), which is currently in the custody of the FBI Portland Division located at 9109 NE Cascades Blvd., Portland, Oregon.

**ATTACHMENT B**

1. All records, documents, or materials in the **Vehicle**, as described in Attachment A, that relate to violations of Title 18, United States Code, Sections 1341, 1343, and 1349, to-wit: engaging in a conspiracy to commit mail and wire fraud and involve **Biao Lin,** including:

    a. all records, documents, or materials, including correspondence, pertaining to the commission of, or conspiracy to commit, mail fraud and wire fraud, as those terms are defined in 18 U.S.C. §§ 1341, 1343, and 1349;

    b. lists of victims and related identifying information;

    c. any information related to co-conspirators and associates involved in the above violations (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording **Lin's** schedule or travel from **January 1, 2024,** to the present; and,

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or

**ATTACHMENT B**                                                                                                    **Page 1**

storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

DISTRICT OF OREGON, ss:                          AFFIDAVIT OF CARYN ACKERMAN

**Affidavit in Support of an Application Under Rule 41 for a Search Warrant**

I, Caryn J. Ackerman, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since February 13, 2011.  My current assignment is with the Portland Field Office, investigating financial crimes, public corruption, and federal civil rights violations.  My training and experience include a law degree from the University of Oregon in 2007, successful completion of training at the FBI Academy in Quantico, Virginia, as well as subsequent participation in various trainings related to corruption, civil rights crimes, and money laundering.

2.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a gray 2023 Kia Soul with Pennsylvania license plate MCS-0690 rented by Biao **LIN** (also referred to as the **Vehicle**), as described in Attachment A, for evidence, contraband, fruits, and instrumentalities, as described in Attachment B, of violations of Title 18, United States Code, Sections 1341, 1343, and 1349, which prohibit persons from conspiring to devise or intending to devise any scheme or artifice to defraud by means of mail or wire communications (the Target Offenses).

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.  The statements contained in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of records related to this investigation, communications with others who

**PAGE 1 - AFFIDAVIT OF CARYN ACKERMAN**

have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

4. Title 18, United States Code, Section 1341, prohibits a person, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, placing in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or depositing or causing to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

5. Title 18, United States Code, Section 1343, prohibits a person, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, from transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

6. Title 18, United States Code, Section 1349, prohibits a person from conspiring or attempting to conspire to commit mail fraud, in violation of Title 18, United States Code, Section 1341, or wire fraud, in violation of Title 18, United States Code, Section 1343.

**PAGE 2 - AFFIDAVIT OF CARYN ACKERMAN**

**Statement of Probable Cause**

7. On October 2, 2024, Adult Victim 1 (AV1) walked into the Portland Field Office of the FBI with her husband, Adult Victim 2 (AV2), and her son, to report she and her husband had been defrauded out of millions of dollars in gold bars at the direction of someone named "Michael Lewis" (hereinafter "Lewis"). Further, AV1 was still in contact with Lewis, and they were expected to provide additional gold at Lewis's direction within the next few days. At the time of their reporting to the FBI on October 2, 2024, AV1 was 86 years old, and AV2 was 93 years old, and they had lost more than $3 million, as a result of this scheme. AV1 and AV2 are residents of Portland, Oregon.

8. According to AV1, this all started on or about June 10, 2024, when AV1 tried to access her online accounts with Vanguard Group, where she had a trust account containing several million dollars, as well as an IRA with several millions of dollars as well. However, instead of gaining access to her account, AV1 was notified her password was not working, and she was locked out of her account. AV1 was then called by someone purporting to be with the Vanguard fraud department and they told AV1 she had been locked out. In fact, AV1 was not contacted by someone from the Vanguard Group, but rather someone purporting to be who was instead a part of this fraud scheme.

9. AV1 was then called again by someone who identified himself as "Christopher Tyler" (hereinafter "Tyler"), also purportedly with the Vanguard fraud department. He was not. Tyler told AV1 her account had been hacked, that her Social Security number had been stolen and they had reported this to the Social Security Administration, that someone had tried to steal money from her Vanguard account, and that she had to take certain safety procedures to ensure

**PAGE 3 - AFFIDAVIT OF CARYN ACKERMAN**

her accounts would be safe. AV1 was then put in touch with "Anna Graves" (hereinafter "Graves") at phone number (210) 460-7700, purportedly with the fraud section of the Social Security Administration; Graves in turn put AV1 in touch with "Michael Lewis" (hereinafter "Lewis") at (410) 452-3406, who was purportedly with the Social Security Administration and was being assigned to her case. He was not actually with the Social Security Administration but rather another member of the fraud scheme. AV1 began communicating with Lewis with the goal of protecting her accounts from fraud.

10. On or about June 11, 2024, at Lewis's direction, AV1 installed on her computer a software program called UltraViewer. According to UltraViewer's website, it is a free remote desktop software, which allows a user "to remote control your client's computer to support them like you're sitting in front of the screen." Lewis also asked for information about AV1's personal life, including details about her banking institutions, grocery stores, and neighbors. Lewis told AV1 he did not know the identities of the hackers putting AV1's accounts at risk, so AV1 must not tell anyone else or go on the Internet to seek information.

11. Lewis told AV1 that Vanguard only insured accounts up to a certain amount and since AV1 had more than that in her accounts, Lewis advised AV1 she had to move her money or else she would lose her money to these hackers. Lewis then directed AV1 to go to US Bank to buy gold bars as a way to safeguard her assets and that she then needed to transfer the gold to the U.S. Treasury for safekeeping, and after her accounts were deemed safe, they would transfer it back to her.

12. On or about June 24, 2024, AV1 used her US Bank account to initiate a wire transfer in the amount of $466,043 USD to purchase gold bars, as directed by Lewis. Upon

**PAGE 4 - AFFIDAVIT OF CARYN ACKERMAN**

successful completion of this first purchase and conveyance of the gold bars, AV1 returned to US Bank to repeat the process and buy additional gold bars. However, US Bank refused to carry out the transfer. Lewis directed AV1 to open a new account at the Washington Federal Bank. The rest of the gold purchases were made via wire transfer from the Washington Federal account, which was funded by AV1's Vanguard accounts.

13.     Throughout the weeks that followed, AV1 continued to purchase gold bars at the direction of Lewis.[1] These purchases were made with several different online gold vendors. Lewis initiated the wire transfer with Washington Federal for each purchase, and Lewis would advise AV1 to be available to verify the transaction with the bank. Soon thereafter, AV1 would receive an automated call from the bank asking her to verify the transaction.

14.     Upon receipt of the gold bars via FedEx, AV1 took pictures of the gold bars and accompanying packing slips. The photos were sent to Lewis via text message, who would then contact her soon thereafter to repackage the gold bars on video. AV1 repackaged the gold bars at Lewis's direction, as he watched on video, wrapping them in Christmas or birthday paper.

15.     Within a short amount of time, Lewis then recontacted AV1 to advise that a courier was on their way or imminently arriving to pick up the package. At this time, Lewis would provide AV1 with a password and tell her to ask the courier for the password before giving them the package. A courier would then arrive at her home, AV1 would ask the courier

---

[1] On or about July 4, 2024, AV1 was contacted by two agents with another federal investigative agency who advised she may be the victim of a fraud scheme. However, AV1 doubted whether the agents were really law enforcement officers. Lewis told AV1 he knew about the agents, and everything was under control, causing AV1 to continue making gold bar purchases at his direction. The FBI has confirmed the two agents who contacted AV1 were actual law enforcement agents with another agency.

**PAGE 5 - AFFIDAVIT OF CARYN ACKERMAN**

for the password, and then would hand the courier the package after receiving the password. Typically, Lewis remained on the phone with AV1 during the pickup.

16. AV1 said that the couriers were not from UPS, USPS, or FedEx, and they were dressed in normal attire. On several occasions, the courier was the same male individual, identified only as "Kevin." However, the last pick up before AV1 visited the FBI, the courier was an Asian woman accompanied by an Asian man in a car.

17. On each occasion, sometime after the package was conveyed, AV1 received from Lewis, via the Internet, what purported to be a U.S. Treasury check for the value of the gold bars. This process of purchase, repackaging, and pick up of the gold bars was repeated on multiple occasions, resulting in a total loss of over $3,000,000 in gold.

18. On or about October 1, 2024, AV1 again made a purchase of gold bars via an online vendor in the amount of $462,398, as directed by Lewis. Since the time of that purchase, AV1 revealed the situation with Lewis to her son and the FBI. AV1 expected to receive the gold bars via FedEx with three to four days. Lewis continued to contact AV1 on October 2 and 3, 2024, but AV1 told Lewis her husband was in the hospital to limit interaction.

19. On or about October 3, 2024, AV1 was notified by FedEx that the package would be delivered to her residence in Portland, Oregon between 9:00AM and 1:00PM on Friday, October 4, 2024. AV1 believed Lewis was also likely to know when the package was scheduled for delivery, as she had observed him access her computer to view emails and other items. Lewis would then expect her to immediately repackage the gold bars on video. Further, AV1 expected that soon after repackaging the items, a courier would arrive at her house with a password to pick up the package. Agents advised AV1 to let Lewis know her husband was out

**PAGE 6 - AFFIDAVIT OF CARYN ACKERMAN**

of the hospital, and FBI Agents prepared a controlled pickup operation that took place on October 4, 2024.

20.     On October 4, 2024, FBI Agents instructed AV1 to proceed with the process she had previously followed upon receipt of the gold via FedEx. AV1 took photos of the gold, which consisted of five one-kilogram gold bars and three smaller 100-gram gold bars, and sent them via text message to Lewis, then she waited for his direction to repackage them on video. FBI Agents also directed AV1's son to assist with preparing a decoy package, which would not actually contain gold bars, to be handed to the courier. A picture of the gold bars is below:



21.     At approximately 11:25PM, Lewis advised AV1 two couriers[2] would be coming for pick up, and the couriers may not arrive until 2:30PM or 3:00PM. Lewis then proceeded to direct AV1 to package the gold in two separate boxes with one box containing two kilograms of

---

[2]     In later communications that followed, Lewis referred to only one courier.

**PAGE 7 - AFFIDAVIT OF CARYN ACKERMAN**

gold and the other box containing 3.3 kilograms of gold.  Lewis also directed AV1 to package the boxes in Christmas paper with the white side facing out.  Lewis then directed AV1 to write her initials and the amounts on the boxes.  AV1's son then proceeded to assist in preparing two decoy packages to match those previously packaged on video.

22. At approximately 3:45PM, Lewis called AV1 and stated the courier was outside, but upon opening her front door, AV1 found no one around.  Soon thereafter, FBI Agents observed a Kia Soul with a Pennsylvania license plate parking near AV1's driveway, and then begin to proceed up the long driveway toward AV1 and AV2's residence.  AV1 and AV2's residence is in Portland, Oregon.  During this time, AV1 remained on the line with Lewis, who conveyed the password was "Richard."  At approximately 3:50PM, the courier arrived at the door, and AV1 asked him for the password.  The man, later identified as **Biao Lin** (hereinafter "**Lin**"), uttered the password "Richard," and AV1 then handed him the two boxes.  After **Lin** gained possession of the boxes and began to walk away from the house, FBI Agents moved in and placed him in custody.

23. As FBI Agents engaged with **Lin**, **Lin** refused to acknowledge any understanding of the English language.  Agents began efforts to obtain the assistance of a Mandarin interpreter to communicate with **Lin**.

24. With the assistance of a Mandarin interpreter translating by phone, Agents provided **Lin** his constitutional *Miranda* warnings, and **Lin** acknowledged understanding his rights and agreed to speak with the Agents.  **Lin** explained he was randomly approached by an unknown Asian man about a week ago in a New York City library.  **Lin** said was offered $200 to

///

**PAGE 8 - AFFIDAVIT OF CARYN ACKERMAN**

fly somewhere to pick something up, and he agreed. The man gave **Lin** a phone, which was not password protected. **Lin** was told he would get instructions on that phone.

25. **Lin** stated he flew into Spokane, Washington yesterday, October 3, 2024, and he made no other stops except to drive directly to Portland. **Lin** said the person who gave him directions on the phone spoke Mandarin with a western accent. **Lin** stated he was told to pick up a package, but he was not told any passwords. **Lin** was supposed to get additional information via phone after picking up the package, but instead he was arrested. **Lin** denied knowing what he was picking up. He advised he had only his suitcase and backpack in the car, and he said the car did not contain any drugs, money, weapons, or gold.

26. On **Lin**'s person, Agents found two cell phones, as well as what appeared to be part of a Delta boarding pass for a flight from Atlanta to Spokane for October 3. Concealed in **Lin**'s jacket was $5,000 in the form of 50 crisp one-hundred-dollar bills, and Agents found $1,394 in cash in his wallet. **Lin** advised he had not yet been paid for making this pick up, as he was supposed to be paid afterward. According to **Lin**, he had to pay for the car rental and flight on his own.

27. Based on my familiarity with other investigations involving gold couriers, I know couriers travel throughout the country to pick up gold from victims and deliver it to co-conspirators. Similarly, in this case, I believe **Lin** traveled via plane from Atlanta to Spokane, then rented the **Vehicle** and drove from Spokane to AV1's residence in Portland. Consequently, I believe information related to **Lin**'s past travel and movements, financial transactions, and recent activities while engaged as a gold courier will be found in the **Vehicle** and could reveal further evidence of **Lin's** participation in the scheme and how the scheme is carried out.

**PAGE 9 - AFFIDAVIT OF CARYN ACKERMAN**

28.   The **Vehicle** is further described here, and in Attachment A, as a rented gray 2023 Kia Soul with Pennsylvania license plate MCS-0690.  Following **Lin**'s arrest, I arranged for a towing company to transport the **Vehicle** to the Portland Field Office of the FBI, located at 9109 NE Cascades Parkway, Portland, Oregon. Fast food trash was removed from the **Vehicle,** and a brief safety search of the vehicle was conducted, given the **Vehicle** would be maintained on the property of the FBI.  Consistent with **Lin**'s statement to the FBI, agents observed a small suitcase, backpack, and other miscellaneous items in the **Vehicle.** Finding nothing unsafe inside the **Vehicle**, the **Vehicle** was locked and remains in the parking lot of the FBI.  I secured the keys in a locked drawer, and there has been no further access to the **Vehicle.** As such, I know the **Vehicle** and its contents remain in substantially the same condition as when it was transported from AV1's residence to the Portland Field Office of the FBI.

### Electronic Records

29.   As described above and in Attachment B, this application seeks permission to search for records that might be found in the **Vehicle**, in whatever form they are found.  One form in which the records will likely be found is data stored on a computer's hard drive, on other storage media, or other digital devices, including cell phones (hereinafter collectively referred to as digital devices).  Thus, the warrant applied for would authorize the seizure of electronic storage media or the copying of electronically stored information, all under Rule 41(e)(2)(B).

30.   I submit that if a computer or storage medium is found in the **Vehicle**, there is probable cause to believe those records referenced above will be stored on that digital device because, based on my knowledge, training, and experience, I know:

///

**PAGE 10 - AFFIDAVIT OF CARYN ACKERMAN**

      a.      Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data.  Therefore, deleted files or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      b.      Wholly apart from user-generated files, digital devices—in particular, internal hard drives—contain electronic evidence of how a digital device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Digital device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

      c.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

///

**PAGE 11 - AFFIDAVIT OF CARYN ACKERMAN**

31. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant but also for forensic electronic evidence that establishes how digital devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any digital device in the **Vehicle**, because, based on my knowledge, training, and experience, I know:

   a. Data on the digital device can provide evidence of a file that was once on the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the digital device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

   b. Forensic evidence on a digital device can also indicate who has used or controlled it. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence

**PAGE 12 - AFFIDAVIT OF CARYN ACKERMAN**

(and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time. Further, forensic evidence on a digital device can show how and when it was accessed or used. Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation. This "timeline" information may tend to either inculpate or exculpate the user of the digital device. Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed

by a review team and passed along to investigators. Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

## Conclusion

32. Based on the foregoing, I have probable cause to believe that **Biao Lin** committed the Target Offenses, and evidence of those offenses, as described above and in Attachment B, are presently located in the **Vehicle,** which is described above and in Attachment A. I therefore respectfully request that the Court issue a warrant authorizing a search of the **Vehicle** described in Attachment A for the items listed in Attachment B and the seizure and examination of any such items found.

///

///

///

**PAGE 14 - AFFIDAVIT OF CARYN ACKERMAN**

33. This affidavit, the accompanying application, and the requested search warrant were reviewed by Assistant United States Attorney (AUSA) Scott Kerin prior to being submitted to the Court. AUSA Kerin informed me that in his opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
CARYN J. ACKERMAN
Special Agent
Federal Bureau of Investigation

Sworn via telephone pursuant to Fed. R. Crim. P. 4.1 at **4:00 pm** on October **22**, 2024.

HONORABLE JOLIE A. RUSSO
United States Magistrate Judge

**PAGE 15 - AFFIDAVIT OF CARYN ACKERMAN**